**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| MAURICE YABBA, as father and next friend to B.Y. and E.Y., minors, ) ) ) | |
| Plaintiff, ) ) | |
| vs. ) ) ) | Case No.: 2:10-CV-643-MEF-SRW (WO—Publish) |
| ALABAMA CHRISTIAN ACADEMY, ) ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

B.Y. and E.Y. have filed suit against Alabama Christian Academy (ACA) for false imprisonment. Because they are minors,[1] they do so through their father, Maurice Yabba, who claims the school's employees instigated or participated in an unlawful arrest of his children. Yabba seeks compensatory and punitive damages on behalf of each child in the amount of $1,000,000.

This cause comes before the Court on ACA's Motion for Summary Judgment (Doc. # 16). For the reasons discussed below, ACA's motion is GRANTED.

---

[1] Neither party discusses the siblings' respective ages. An affidavit submitted with ACA's motion, however, estimates the children were about 15 years old at the time of the incident. (Doc. # 14-3.)

## II. JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332.[2] The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations to support both.

## III. THE RELEVANT FACTS

Maurice Yabba, B.Y., and E.Y. left their home in St. Croix to visit relatives in Montgomery, Alabama. (Doc. # 14-1.) While enjoying their stay, the siblings left their grandparents' house around 4:00 or 4:30 p.m. to go for an afternoon walk. (*Id.*) Since it was early August in Alabama, B.Y. became thirsty during the walk, and so he went looking for a water fountain on Alabama Christian Academy's campus. (*Id.*) Meanwhile, E.Y. waited for him outside on the sidewalk.[3] (*Id.*)

That same afternoon, a number of ACA students stayed on campus for after-school band practice. As they marched back to the building after practicing outside, some of the band members saw the siblings on campus. Probably thinking nothing of it, they continued on their way to the band room. Once there, they noticed that someone had rifled through their belongings: one student even claimed that a dollar was missing from her purse. (Doc. # 14-

---

[2] A territory of the United States is considered a State when determining subject matter jurisdiction based on diversity. 28 U.S.C. § 1332(e). Here, E.Y., B.Y., and their father Maurice reside in St. Croix, United States Virgin Islands. Because Alabama Christian Academy is considered an Alabama citizen, the parties satisfy the complete diversity requirement. And since the siblings each seek over $1,000,000 in compensatory and punitive damages, their claims push past the $75,000 minimum amount in controversy threshold.

[3] The affidavits submitted by ACA state that E.Y. entered the building as well. (*See* Docs. # 14-3, -4, -5.) In the interrogatories, however, E.Y. claims to have stayed outside on the sidewalk. (Doc. 14-1.) Because this case is at the summary judgment stage, the Court must believe the nonmoving party's evidence. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). The Court, therefore, credits E.Y.'s claim as true.

5.)

Around the time that band practice ended, some parents of ACA students sat and waited to pick up their children. (Docs. # 14-3, -4.) As they did, they too saw the unfamiliar pair on ACA's property. The students told their parents about the missing money, which, in turn, caused the parents to suspect the two unfamiliar children. (Doc. # 14-2.) The parents, acting on their suspicion, called the police and then told two ACA employees—Janet Morrison and Howard Todd—what had happened. (*Id.*)

In the meantime, B.Y. and E.Y. had started the walk back to their grandparents' house. Before they made it there, however, Vince Faulk—an ACA parent and UPS driver—drove down Wares Ferry Road and spotted the pair entering a local neighborhood. (Doc. #14-3.) Faulk had seen B.Y. and E.Y. walk toward the band room while he waited in the parking lot for his daughter to finish with band practice. (*Id.*) Although he thought nothing of it at the time, Faulk began looking for the siblings after he heard that some of the students had their personal items rummaged through. (*Id.*) And once he spotted them on Wares Ferry, he called the police to tell of E.Y. and B.Y.'s location. (*Id.*)

The police acted on Faulk's tip, and showed up at the sibling's grandparents' house around 6:00 p.m. (Doc. # 14-1.) The officers explained that a burglary had just occurred at ACA. (*Id.*) And they proceeded to search the house and some personal items before arresting the children. (*Id.*) The police drove the siblings back to the school where some of the remaining students recognized B.Y. and E.Y. as the children they had seen earlier on campus. (Doc. # 14-4.)

Around 6:45 p.m., the police took the siblings to the police station, placed B.Y. in a holding cell, and handcuffed E.Y. to a desk in a room facing B.Y.'s cell. (Doc. #14-1.) Some of the ACA students and parents were also at the station because the police had asked them to come identify the siblings. (Doc. # 14-2.) The student whose money was missing and who did not have a parent with her had Todd—the ACA employee who had heard the story—accompany her to the station. (*Id.*) Todd stayed for about ten minutes, did not file a report, and did not give a statement to the police. (*Id.*) The parent of the student he accompanied arrived later and decided not to press charges against either B.Y. or E.Y. (Doc. # 14-4.)

Two parents, Vince Faulk and Edwin Rogers, and one student, C.R., testified that ACA's employees did not call the police, participate in identifying the siblings, or instigate the arrests. (Docs. # 14-3, -4, -5.) But B.Y. says that a man introduced himself to him as ACA's principal at the police station. (Doc. #14-2.) And that man told B.Y. he would drop the charges against the siblings if he promised not to step foot on his property again.[4] (*Id.*) The police released B.Y. and E.Y. to their grandparents about 30 minutes after B.Y.'s encounter with the principal. (*Id.*) All told, police had custody of the siblings for about 2 hours. (*Id.*)

The children brought suit through their father, claiming that ACA instigated or participated in their false imprisonment. And ACA brought the motion for summary

---

[4] Other than this encounter, neither of the siblings met anyone else associated with ACA.

judgment now before the Court.

## IV. LEGAL STANDARD

A motion for summary judgment looks to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court should grant summary judgment when the pleadings and supporting materials show that no genuine issue exists as to any material fact and that the moving party deserves judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the relevant documents that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To shoulder this burden, the moving party can present evidence to this effect. *Id.* at 322–23. Or it can show that the nonmoving party has failed to present evidence supporting some element of its case on which it bears the burden of proof. *Id.*

If the moving party meets its burden, the non-movant must then designate, by affidavits, depositions, admissions, and answers to interrogatories, specific facts showing the existence of a genuine issue for trial. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995). And a genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in his or her favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). Thus, summary judgment requires the nonmoving party to "do more than simply show that

there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Indeed, a plaintiff must present evidence demonstrating that he can establish the basic elements of his claim, *Celotex,* 477 U.S. at 322, because "conclusory allegations without specific supporting facts have no probative value" at the summary judgment stage. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

A court ruling on a motion for summary judgment must believe the non-movant's evidence and draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. After the nonmoving party has responded to the motion, the court must grant summary judgment if there exists no genuine issue of material fact and the moving party deserves judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

## V. DISCUSSION

### A. The applicable law

When a federal court exercises jurisdiction based on the parties' diversity of citizenship, it must apply the substantive law of the state in which it sits. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). And the *Erie* doctrine extends to choice-of-law questions, meaning that a court sitting in diversity must apply the forum state's choice-of-law rules. *Strochak v. Fed. Ins. Co.,* 109 F.3d 717, 719–20 (11th Cir. 1997) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). The siblings' false imprisonment claim sounds in tort, and the claimed injury arose within Alabama's borders. The State's choice-of-law rule thus requires this Court to apply Alabama law. *Fitts v. Minn. Mining & Mfg. Co.*, 581 So. 2d 819, 820 (Ala. 1991) (". . . an Alabama court will determine the substantive rights

of an injured party according to the law of the state where the injury occurred.") (citations omitted).

### B. The siblings' false imprisonment claim

Under Alabama law, "[f]alse imprisonment consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." Ala. Code § 6-5-170 (1975). This includes directly restraining a person as well as threatening force to keep him in place or make him go where he does not wish to go. *Crown Central Petrol. Corp. v. Williams*, 679 So. 2d 651, 653 (Ala. 1996). As a general rule, someone besides the person who actually makes an unlawful arrest can face liability for instigating or participating in another's false imprisonment. *Id.* at 654. An employer, moreover, incurs liability when one of its employees, acting within the scope of his employment, falsely imprisons another person. *Id.* at 653–54.

But these general rules have major limitations. First, someone who simply reports a potential crime to the police will not face liability for false imprisonment. "[S]uch an act 'is not regarded . . . as an instigation or participation in the detention or arrest.'" *Dolgencorp, Inc. v. Pounders*, 912 So. 2d 523, 528 (Ala. Civ. App. 2005) (citing *Crown Central*, 679 So. 2d at 654). Second, even when someone gives information to the police that leads to another's arrest, liability only attaches when the informer acts in bad faith. *See Crutcher v. Wendy's of N. Ala., Inc.*, 857 So. 2d 82, 92 (Ala. 2003) ("[U]nder Alabama law an employer will not be held liable for false imprisonment for the acts of its employees in providing information to the police, which causes someone to be detained, if the employee's

7

communications . . . were made in good faith."). By the same token, Alabama has long articulated a public policy in favor of calling the police when a citizen believes criminal activity is afoot. *See Daniel v. Goodyear Tire & Rubber Co.*, 143 So. 449, 451 (Ala. 1932) ("We think the policy of the law, the great public need for active aid in the apprehension of criminals, imposes an obligation in the nature of a public duty upon those in best position so to do, and unless affirmatively shown to have been done from other motive, or in an unlawful manner, liability should never be imposed.").

Keeping these principles in mind, the question becomes, did Yabba produce enough evidence to create a genuine issue of material fact about whether ACA instigated or participated in the false imprisonment of his children?

### 1. ACA's alleged instigation or participation

On the one hand, a person incurs liability for instigating the arrest of another by inviting or encouraging the false imprisonment itself. *Pounders*, 912 So. 2d at 528. On the other hand, reporting or requesting a lawful arrest falls short of the standard. *See id.*; *see also Lewis v. Farmer Jack Div., Inc.*, 327 N.W. 2d 893 (Mich. 1982) (holding legally justifiable arrest could not serve as basis for plaintiff's false imprisonment claim even when underlying criminal charges later dismissed). Addressing the tension between the lawful reporting of criminal activity and the unlawful instigation of an arrest, the *Pounders* court discussed the situation as follows:

> Instigation consists of words or acts which direct, request, invite or encourage the false imprisonment itself. *In the case of an arrest, it is the equivalent, in words or conduct, of 'Officer,*

> *arrest that man!'* It is not enough for instigation that the actor has given information to the police about the commission of a crime, or *has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest*, without persuading or influencing them. Likewise it is not an instigation of a false arrest *where the actor has requested the authorities to make a proper and lawful arrest, and has in no way invited or encouraged an improper one*, or where he has requested an arrest at a time when it would be proper and lawful, and it is subsequently made at a time when it has become improper.

*Pounders*, 912 So. 2d at 528 (citing *Restatement (Second) of Torts* § 45A, cmt. c.).

Alabama courts, moreover, have emphasized the impropriety of using hindsight to look at actual guilt or innocence when determining whether someone instigated an arrest unlawfully. Instead, the inquiry focuses on the time of the arrest and whether the arresting party made it lawfully—not whether the arrest leads to criminal charges and a conviction. In *Pounders*, for example, a store manager called the police to report a potential shoplifting after seeing a shopper with a large purse enter and leave the store's bathroom multiple times. 912 So. 2d at 525–26. The shopper, as it turned out, had an episode of diarrhea brought on by her cancer treatment. *Id.* at 526. Still, the store manager did not face liability for false imprisonment: the lack of testimony showing the manager directed or persuaded the police officers to make the arrest required the court to enter judgment for the defendant.[5] *See id.* at 529.

---

[5]Because Yabba failed to put forth evidence showing that ACA reported the crime, it is not necessary to ask whether the police, acting at the direction of ACA, made a wrongful arrest. *Cf. Walker v. Briley*, 140 F. Supp. 2d 1249 (N.D. Ala. 2001) (looking at probable cause and inquiring into objective reasonableness of an arrest when analyzing plaintiff's false arrest claim).

9

Here, ACA submitted three affidavits showing that none of its employees or representatives instigated or participated in the siblings' detainment. First, Vince Faulk, a parent of an ACA student, testified that he and one other parent called the police and that "no ACA employees or representatives" took part in the same. (Doc. # 14-3.) Second, Edwin Rogers—another ACA parent—likewise testified that he called the police after his son told him that two individuals entered the band room and took money from a student's purse. (Doc. # 14-4.) Rogers also says he participated in identifying E.Y. and B.Y., and, like Faulk, stated that no ACA employees partook in calling the police or identifying the siblings. (Doc. # 14-4.) Third, C.R., an ACA student, testified that he saw the siblings on campus, identified them when the police brought them back to campus, and "did not see any ACA teachers or officials call the police or identify the individuals." (Doc. # 14-5.) The testimony of Faulk, Rogers, and C.R. suffices to shift the burden to Yabba, the nonmoving party, to show a genuine issue of material fact on this question.

Yabba, however, failed to submit evidence contradicting the trio's testimony. And in response to an interrogatory asking for a detailed description about why "Alabama Christian Academy was at fault," Yabba answered, "The officers involved [in] the incident are not known at this time." So the uncontradicted testimony shows that no ACA employee called the police or identified the siblings—let alone participated in or instigated their detainment.[6]

---

[6]In Yabba's response to ACA's interrogatories, he responded to a question about what facts he knew regarding ACA's involvement in the false imprisonment as follows: "Persons employed by ACA as officers, agents, or employees caused officers of the Montgomery Police Department to unlawfully detain and arrest B.Y. and E.Y." (Doc. #14-1.) But the evidence submitted by ACA directly contradicts this conclusory assertion. Because Yabba failed to support his conclusion with facts, the Court need not accept it as true at

Yabba has failed to put forth evidence on a material element of his claim whereas ACA has shown that it deserves judgment as a matter of law. *See Pounders*, 912 So. 2d at 529 (granting judgment as a matter of law when there was "absolutely no evidence that [the store manager] accompanied or assisted" the police officer "so as to warrant a conclusion that [he] was a 'participant' in any detention"); *Crown Central*, 679 So. 2d at 654 (granting summary judgment where evidence failed to show defendant's employee expressly directed the plaintiff's arrest).

Yet Yabba contends that ACA became a participant after the fact and claims this suffices for false imprisonment liability for two reasons. First, B.Y. testified that ACA's principal visited the jail and promised not to press charges if the siblings refrained from trespassing in the future. Yabba theorizes from this that "ACA controlled the decision as to whether B.Y. and E.Y. would be charged with a crime." (Doc. # 18.) In other words, he claims that because the police refrained from charging the siblings at the behest of the principal, "ACA thereby became an instigator and participant in the false arrest of B.Y. and E.Y. through directing and encouraging the officer['s] decision in this matter." (*Id.*) Second, Yabba asserts that Howard Todd "participated in the false arrest of B.Y. and E.Y." by taking to the police station the student whose money was missing. (*Id.*)

But there is a dearth of Alabama case law holding that a defendant can incur liability

---

the summary judgment stage. *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (granting summary judgment when plaintiff produced only "his own conclusory allegations:); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("[M]ere verification of a party's own conclusory allegations is not sufficient to oppose a motion for summary judgment . . . .").

11

without participating in the plaintiff's initial arrest and detainment. *Pounders* actually suggests an opposite conclusion: there the court looked at the situation *up to* the police's arrival (the shopper's strange behavior), but ignored what happened *after* that (the shopper's explanation and the lack of stolen goods in her purse). This case goes one step further: ACA's involvement is even more attenuated since the evidence shows that *any* involvement by ACA occurred after the initial detention and confinement. Indeed, Howard Todd drove the student to the police station *after* the arrest, and the alleged appearance by the principal took place *even later* than that.

Besides, it would make little sense to impose liability on ACA for false imprisonment because ACA's principal asked the police to release the siblings from prison. That would punish ACA for refraining from pressing charges after the parties had sorted out the situation at the police station. A contrary holding would subject crime victims and witnesses to civil liability when the victim foregoes pressing charges in close cases or where the situation does not merit starting into motion the heavy machinery of the state's criminal justice system. This would create an incentive either to abstain from reporting a potential crime, which would contravene Alabama's stated public policy, *Daniel*, 143 So. at 451, or to press charges so the victim can immunize himself and any witnesses from civil liability even when, like here, it would make more sense to handle the situation another way. For these reasons, this Court finds that Alabama law does not impose liability for false imprisonment when a school's employee merely accompanies a student to the police station to identify a suspect or when

a school official decides against pressing charges on behalf of the school.[7]

In sum, Yabba has not put forth evidence showing that an ACA employee instigated the arrest. Nor has he convinced this Court that Alabama law imposes liability for false imprisonment when someone who gets involved in a criminal matter does so only after the arrest takes place. As a result, he has failed to produce sufficient evidence to survive ACA's summary judgment motion.

### 2. ACA's good faith

Yabba also fails to show that there exists a genuine issue of material fact regarding whether the ACA employees acted in good faith. Without evidence showing the individuals who instigated the arrest acted in bad faith, Alabama law requires this Court to grant summary judgment. *See Crutcher*, 857 So. 2d at 92. Even assuming an ACA employee initiated or participated in the arrest, none of the evidence submitted suggests that he or she lacked "any reasonable basis upon which to accuse another of a crime." *Id.* In fact, Yabba does not deny that at least one of his children trespassed on ACA's property, and the facts show that a student reported a theft around the time his children were seen in and around the school. These circumstances would have given an ACA employee a reasonable basis for calling the police. *See Kmart Corp. v. Perdue*, 708 So. 2d 106, 109–10 (Ala. 1997) (holding malicious prosecution claims should not have gone to jury, stating, "[the] question is not whether [the plaintiffs] were guilty of shoplifting, but whether [the store's employee] in fact

---

[7]That Alabama recognizes a cause of action for malicious prosecution further persuades this Court that one cannot incur liability for false imprisonment after the arrest and detainment occur.

13

saw events that would have led him to believe that they were").

Either way, Yabba did not address ACA's argument on this point in his summary judgment brief. Nor did he submit evidence showing bad faith on ACA's part in any of the actions taken by a school official or representative. He has thus failed to provide "evidence beyond the pleadings" on an essential element of his claim. *See Celotex*, 477 U.S. at 323 ("failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). Accordingly, the lack of evidence showing bad faith on the part of ACA further merits entering summary judgment in the school's favor.

## VI. CONCLUSION

For the reasons discussed above, Alabama Christian Academy's Motion for Summary Judgment (Doc. # 16) is GRANTED.

Done this the 8th day of November, 2011.

/s/ Mark E. Fuller
UNITED STATES DISTRICT JUDGE